**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Harold Johnson, | ) | Case No.: 06-02537-BGC-13 |
| | ) | |
| Debtor. | ) | |
| | | |
| Harold Johnson, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | A. P. No.: 06-00164 |
| | ) | |
| Precision Auto Sales, | ) | |
| | ) | |
| Defendant. | ) | |

This Memorandum Opinion was not submitted by the Court for publication.

**MEMORANDUM OPINION**

The matter before the Court is the <u>Complaint for Turnover of Vehicle and For Violation(s) of the Automatic Stay</u> filed on September 12, 2006, and amended on September 25, 2006. After notice, a trial was held on April 26, 2007. Appearing were Harold Johnson, the debtor; his attorney Eric Heath Johnson; the debtor's wife, Sharon Johnson; Monica Austin-Hatcher, attorney for the defendant Precision Auto Sales; and Lawanda Welch and Marvin Kidd, employees of the defendant. The matter was submitted on testimony, exhibits, pleadings, and arguments of counsel.

### I. Background

The plaintiff purchased a1996 Buick Century from the defendant in February 2006. The debtor filed the pending Chapter 13 case on July 20, 2006. Without relief from the stay, the defendant repossessed the vehicle on September 9, 2006. The debtor retrieved his vehicle on October 26, 2006.

### II. Contentions

The plaintiff contends that the defendant had knowledge of the bankruptcy filing and subsequent proceedings, and that the defendant's actions of ignoring the filing and subsequent proceedings were multiple, willful violations of the automatic stay. The debtor contends that he was injured by the defendant's actions. The debtor seeks actual damages, including attorney fees and costs, and punitive damages.

The defendant denies the plaintiff allegations. The defendant contends that it has two locations, one at Precision Auto Sales, 1725 Lomb Avenue West, Birmingham, Alabama, 35208 and another at CS III, Auto Sales & Repair, Inc., #5 - 18th Street Southwest, Birmingham, Alabama, 35211. The defendant contends that the CS III location is its corporate office and the Precision Auto location is an unmanned location. The defendant contends that the notice of the bankruptcy filing, and other correspondence, were all sent to the Precision location. Consequently, the defendant contends that it did not receive notice of the bankruptcy or any subsequent events until the debtor amended his complaint to include the CS III location.[1]

### III. Applicable Law

### A. The Automatic Stay

Section 362(a)(6) of the Bankruptcy Code provides that the filing of a bankruptcy petition operates automatically as a stay of "any act to collect, assess or recover a claim against the debtor that arose before the commencement of the case under this title...." 11 U.S.C. § 362(a)(6). Under subsection (c)(2) of section 362, the stay provided for under subsection (a)(6) continues until the case is closed, or the time the case is dismissed, or a discharge is granted or denied to the debtor, whichever occurs first. 11 U.S.C. § 362(c)(2).

### B. Actual Damages for a Willful Violation
### of the Automatic Stay

Section 362(k) provides, "An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k).[2] For damages to be awarded to an individual under that section, the individual must prove an injury caused by the stay violation and that the violation of the stay was willful. A violation of the automatic stay is a "willful violation" if, "the violator (1) knew of the automatic stay and (2) intentionally committed the violative act, regardless whether the violator specifically intended to violate the stay." Jove Eng'g, Inc. v. Internal Revenue Serv., 92 F.3d 1539, 1555 (11th Cir.1996).

### C. Punitive Damages in Appropriate Circumstances

Section 362(k) allows an award of punitive damages for stay violations in "appropriate circumstances." "Appropriate circumstances" has been interpreted to

---

[1] The representation was made that the two locations were only around the block from each other and that the business relied on both locations to operate.

[2] Subsection (k) was subsection (h) before recent amendments to the Bankruptcy Code. Therefore, many of the cases discussing stay violations will refer to this subsection as (h).

2

require that the violator's acts be egregious, vindictive, malicious, or accompanied by bad faith. "[E]gregious, intentional misconduct on the violator's part is necessary to support a punitive damages award." <u>United States v. Ketelsen (In re Ketelsen)</u>, 880 F.2d 990, 993 (8th Cir.1989). "An additional finding of maliciousness or bad faith on the part of the offending creditor warrants the further imposition of punitive damages pursuant to 11 U.S.C. § 362(k)." <u>Crysen/Montenay Energy Co. v. Esselen Assocs., Inc. (In re Crysen/Montenay Energy Co.)</u>, 902 F.2d 1098, 1105 (2nd Cir.1990). "[O]nly egregious or vindictive misconduct warrants punitive damages for willful violations of the automatic stay of 11 U.S.C. § 362." <u>Davis v. Internal Revenue Serv.</u>, 136 B.R. 414, 424 (E.D.Va.1992).[3]

## IV.  Findings of Fact

### A.  Facts from the Parties' <u>Joint Stipulation of Facts</u>

The parties' <u>Joint Stipulation of Facts</u> reads:

1.  This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §157(b)(2)(e);

2.  That the Debtor filed a Chapter 13 petition on July 20, 2006;

3.  That the Plaintiff/Debtor listed the Defendant, Precision Auto Sales, as a secured creditor in his case with the proper address of said Defendant/Creditor;

4.  That the Plaintiff/Debtor purchased a 1996 Buick Century from Precision Auto Sales on or about February 2006;

5.  That the Defendant/Creditor repossessed the Plaintiff/Debtor's 1996 Buick Century on September 9, 2006 and refused to return said vehicle to the Plaintiff/Debtor even after being notified on the Plaintiff/Debtor's Chapter 13 case.

6.  That a Complaint for the turnover of the Debtor's vehicle was filed on September 12, 2006, by the Plaintiff;

7.  That the Defendant/Creditor did not return the 1996 Buick Century to the Debtor until October 26, 2006, wherein this Court granted Plaintiff's Motion for Temporary Restraining Order;

---

[3]  See this Court's opinion in <u>Cox v. Billy Pounds Motors, Inc. (In re Cox)</u>, 214 B.R. 635 (Bankr. N.D. Ala.1997).

Case 06-02537-BGC13    Doc 61    Filed 08/07/07    Entered 08/07/07 09:38:30    Desc Main
Document    Page 3 of 24

8. That the Defendant/Creditor sent the Plaintiff/Debtor a certified letter demanding payment of $2,739.22 in order for the Plaintiff/Debtor to regain possession of the 1996 Buick Century a copy of which is in the record as Plaintiff's Exhibit "A";

Joint Stipulation of Facts, April 26, 2007 (Proceeding No. 36).[4]

## B. Facts from the Court's September 21, 2006, Order

The Court made the following findings of fact in its September 21, 2006, order granting a temporary restraining order in favor of the debtor. That order is final and was not appealed. The order read in part:

The facts are straightforward. The debtor filed the pending Chapter 13 case on July 20, 2006. He listed Precision Auto Sales, 1725 Lomb Avenue West, Birmingham, Alabama, 35208, as one of his secured creditors. The debtor listed the debt to Precision for $2,100 and specified that it was secured by a 1996 Buick Century automobile.

Written notice of the pending case was sent to Precision on July 21, 2006, at the address provided by the debtor. And the debtor has since given the defendant oral notice of the bankruptcy.

On September 9, 2006, a representative of Precision repossessed the 1996 Buick Century. Personal items, including a prepaid cellular telephone, were in the automobile when it was repossessed.

In his Motion for Ex Parte Temporary Restraining Order the debtor seeks to restrain the defendant from selling or otherwise disposing of the vehicle or the personal property in the vehicle when it was repossessed.

Precision has not requested, and this Court has not ordered, relief from the automatic stay that arose when this case was filed.

In his proposed Chapter 13 plan, the debtor proposes to pay Precision $2,100 at 7 percent interest, with payments of $50.00 per month. The debtor also proposed to pay Precision pre-confirmation adequate protection payments of $100.00 per month. A confirmation hearing is scheduled for October 3, 2006, at 1:00 p.m.

Order, September 21, 2006 (Proceeding No. 9).

---

[4] Proceeding numbers refer to the adversary proceeding number 06-00164, not the main case number 06-02537.

4

## C. Facts from the Court's and the
## Chapter 13 Trustee's Records

The debtor filed his Chapter 13 case on July 20, 2006. In his Chapter 13 plan, the debtor proposed to pay the defendant $2,100 at 7 percent interest, with payments of $50.00 per month. The debtor also proposed to pay Precision pre-confirmation adequate protection payments of $100 per month. According to the Chapter 13 trustee's records, the debtor's first plan payment was posted by the Chapter 13 trustee on September 8, 2006, the day before the vehicle was repossessed.[5] A confirmation hearing was scheduled for October 3, 2006, at 1:00 p.m. The debtor's proposed plan was confirmed on December 12, 2006. Since confirmation, the debtor has made all of his Chapter 13 plan payments and is current through July 27, 2007. He has paid over $12,600 into this case from September 8, 2006, through July 13, 2007, by a wage deduction request to his employer.

The debtor listed the defendant Precision Auto Sales in his bankruptcy petition with an address of 1725 Lomb Avenue West, Birmingham, Al, 35208. The debtor testified, which was not controverted, that he listed Precision at that address because: (1) he made his pre-bankruptcy payments to Precision at that address; and (2) that address was listed on the receipts he was given after he made monthly payments on his debt for the vehicle. The debtor had little other documentation about his transactions with the defendant because most of his other documents were in the vehicle when it was repossessed. None of those documents have been returned to the debtor.

The debtor filed the pending complaint on September 14, 2006, five days after his car was repossessed. The debtor asked the Court to order the defendant to return his vehicle. The defendant was served a copy of the complaint at Precision Auto Sales, 1725 Lomb Avenue West, Birmingham, Al, 35208.

On September 19, 2006, the debtor filed a <u>Motion for Ex Parte Temporary Restraining Order</u>. A hearing was scheduled for September 21, 2006 at 9:00. The defendant was given notice of the hearing on September 19 at its Lomb Avenue address. No one appeared for the defendant. Based on the testimony of the debtor, the pleadings and arguments, the Court announced that it would enter the restraining order.

On September 21, 2006, the Court entered the restraining order prohibiting the defendant from disposing of the vehicle. A copy of the temporary restraining order was served on the defendant on September 23, 2006, at its Lomb Avenue address.

---

[5] The Chapter 13 trustee's records also show that during the time the defendant was holding the vehicle, the debtor made all of his proposed bi-weekly Chapter 13 payments from September 22, 2006, through October 17, 2006.

5

On September 25, 2006, the debtor amended his complaint, and on October 10, 2006, the debtor filed an amended motion for a permanent restraining order.

Also on October 10, 2006, the debtor filed a certificate of service that the amended complaint had been served on the defendant at the CS III location. Proceeding No. 16. That certificate included a copy of a return receipt request card signed by "Stacy _____", an employee of the defendant, on October 3, 2006, demonstrating that the defendant received a copy of the amended complaint.[6] Another employee of the defendant testified that "Stacy" was an employee of the defendant.

### D.  Facts from the Defendant's "Notice of Our Plan to Sell Property"

After the defendant repossessed the debtor's Buick, it sent the debtor a "Notice of Our Plan to Sell Property" dated September 9, 2006. That notice read in part:

We have your vehicle, as follows: 94 BUICK CENTURY because you failed to comply with the terms of our agreement. We plan to sell this vehicle. You can get this vehicle back before we sell it by paying the entire amount you owe (not just the past due payments) including our expenses. This amount is currently 2,739.22 but may go up if our expenses go up.

.....

If you do not redeem this vehicle we will sell this vehicle. You have the right to demand a public sale. If you do not notify us that you demand a public sale then we will sell the vehicle at a private sale. We will sell this vehicle as soon as 10 days from the date of this notice.

Plaintiff's Exhibit 1.

### E.  Facts from the April 26, 2007, Trial

### 1.  Facts "from" Mr. Charlie Smith

Mr. Charlie Smith, who was not formally introduced to the Court, is apparently either the principal of the defendant corporation or its owner. Mr. Smith has not attended any of the hearings on this matter and did not attend the trial on April 26, 2007. In regard to the trial, counsel for the defendant explained that "**Mr Smith wasn't**

---

[6] The last name is not legible.

6

**able to make it this morning.**"[7]  That explanation did not include that Mr. Smith  was ill, had a more pressing appointment, had a serious problem, or had a family matter.  It was only that he "wasn't able to make it this morning".  In lieu of his appearance, Mr. Smith asked his corporation's attorney, whom he had placed in quite a difficult situation, to inform the Court of his unsubstantiated contentions.  Those contentions were that the notices about the bankruptcy and subsequent events were sent to the "wrong" location, that the car was repossessed without his actual knowledge of the bankruptcy filing, and that once the notices were sent to the proper location, he was able to straighten out the matter.[8]

Because Mr. Smith did not testify, this Court may reasonably infer <u>from his failure to testify</u> that he would have not been able to support his contentions and would not have been able to refute the debtor's testimony about the repossession and the facts surrounding the repossession.[9]  And certainly, because he did not testify, Mr. Smith

---

[7] Defendant's counsel conducted herself in a very competent and highly professional manner.  She represented her client well.  It was clear she tried to put the best light on Mr. Smith's failure to appear, without misleading the Court or harming her client (which she did neither).  The Court appreciates her efforts and understands the difficult position she was in.

[8] The evidence is that the repossession was on September 9, 2006.  The debtor was not able to pick up his vehicle until October 26, 2006.  And in that interim, not only did the Court send the defendant numerous documents about this matter, as explained above, one of the defendant's employees signed for a certified letter on October 3, 2006, containing information about the bankruptcy.  <u>But, it was still 23 days before the defendant returned the vehicle.</u>  But giving the defendant the benefit of all of its contentions, the fact remains that the vehicle was repossessed <u>after</u> the case was filed and without relief from the stay.  So in any event, the defendant violated the stay and continued to do so long after its employee signed for the amended complaint.

[9] "When a party to a civil action fails to testify and explain facts and circumstances peculiarly within his knowledge and ability to provide, the inference is justified that the testimony would be adverse ...." <u>United States v. Marlow</u>, 235 F.2d 366, 368 (5ᵗʰ Cir. 1956)(action by widow of deceased veteran to recover proceeds of National Service Life policy which named her as beneficiary wherein she contended marriage of second wife to veteran was invalid because of existence of prior undissolved marriage of veteran at time second marriage was entered into, but where widow did not testify, there was an inference that first marriage had been dissolved).  <u>See also</u> <u>United Broadcasting Co. v. Armes</u>, 506 F.2d 766, 770 (5ᵗʰ Cir. 1975)(in action brought by client to enjoin private investigator from proceeding with suit in Mexico to recover fee for certain services and investigator's counterclaim for his fee, jury could infer from failure of client to appear and testify that his testimony would have been unfavorable to his cause), <u>cert. denied</u>, 421 U.S. 965 (1975); <u>Leveson v. United States</u>, 262 F.2d 659, 661 (5ᵗʰ Cir. 1959)(in civil proceeding on claim to recover $16,833 in cash seized by the United States from safe located in room adjacent to illegal betting establishment, failure of claimant, who owned the safe, to testify or otherwise attempt to explain presence of money in the safe could be considered as evidence of the fact that money was being used in the gambling

was not available to offer a defense to the complaint or to rebut the evidence that the defendant's actions were a willful violation of the stay and that appropriate circumstances exist for punitive damages.

---

operation); Daniel v. United States, 234 F.2d 102, 106 (5th Cir. 1956)(in civil action brought by United States against nonveteran for fraudulently obtaining surplus trucks through veterans in violation of Surplus Property Act, failure of defendant to either take the stand, or show that he was unable to testify, or even to offer any excuse whatever for his failure to testify in explanation of suspicious facts and circumstances peculiarly within his knowledge, fairly warranted the inference that his testimony, if produced, would have been adverse to his cause), cert. denied, 352 U.S. 971 (1957); Williams v. United States, 199 F.2d 921, 922-923 (5th Cir. 1952)(in civil action filed by the United States for condemnation of a truck and automobile alleged to have been used in violation of the Internal Revenue Laws by carrying materials to be used in the illegal manufacture of illicit whiskey, failure of claimants of vehicles to take the stand to explain, or attempt to explain, what they intended to do with the materials found in the vehicles was a circumstance which could be considered against them); Anderson v. United States, 185 F.2d 343, 346 (5th Cir. 1951)(in proceedings filed by United States for purpose of condemning and forfeiting an automobile alleged to have been used in illegal deposit and concealment of tax-unpaid distilled spirits, intent to defraud could be inferred from failure of claimant of automobile to testify since "[t]he pertinent and controlling evidence was within his knowledge and it was within his power to explain the circumstances connected with the transaction, yet he declined to testify.").

"The production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse. Silence then becomes evidence of the most convincing character." Interstate Circuit, Inc. v. United States, 306 U.S. 208, 226 (1939)(citations omitted)(in suit by the United States to enjoin defendants from carrying out alleged conspiracy in restraint of interstate commerce between distributors and exhibitors of motion picture films, failure of defendants to tender the testimony, at their command, of those officers who had authority to act for the distributors and who were in a position to know whether they had acted in pursuance of agreement was itself persuasive evidence that their testimony, if given, would have been unfavorable to the defendants). "'It is well settled that the production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse." Creel v. C.I.R., 419 F.3d 1135, 1142 (11th Cir. 2005)(in proceeding by IRS to levy on civil tax liabilities allegedly remaining unpaid after taxpayer's criminal restitution obligation was satisfied, Tax Court properly inferred from failure of IRS to present witness from U.S. Attorney's Office that any testimony from such a witness would have been unfavorable to the IRS). See also Harris v. C. I. R., 461 F.2d 554, 556 (5th Cir. 1972)(where, in proceeding arising from disallowance of gift tax exclusions on the basis of original instruments despite amendments in a later year to adopt language which would have qualified taxpayers for exclusions if used in the original instruments, the attorney who drafted the instruments represented taxpayers at trial and said in his opening statement that the discrepancy between the original and amended instruments resulted from mere typing errors, but did not take the stand to testify, the Tax Court properly inferred that his testimony would not have been favorable to his clients).

8

In addition, because he did not testify there is absolutely no evidence to support Mr. Smith's contentions that he did not have notice of the bankruptcy filing or the events that occurred after. But there is uncontroverted evidence that: (1) he was responsible for having the debtor's vehicle repossessed; (2) even if he did not know about the bankruptcy before the repossession, the debtor told him about it on the day of the repossession; (3) he was told again about the bankruptcy two days after the repossession by the debtor and the debtor's attorney; and (4) one of the defendant's employees accepted delivery of the amended complaint. But contending that he never knew about the bankruptcy until almost 45 days after the repossession, the defendant's principal kept the debtor's vehicle.

## 2. Facts from the Trial Testimony

The debtor, his wife Sharon Johnson, Ms. Welch and Mr. Kidd testified at the hearing.

In summary, the testimony of the debtor and his wife established that the debtor drives an 18-wheeler for the U.S. Postal Service. His work day begins in the early morning. He works the 2:15 a.m. to 10:45 a.m. shift. After his car was repossessed, his wife had to get up with him and take him to work around 2:00 a.m. each day. She would then have to go home, get her children ready for school, and then go to work herself. Because of the repossession, the debtor lost some days at work, and frequently lost overtime work, which he valued at $800. He explained he would have earned that amount in overtime if he had not had to leave early to catch the only ride he could when his shift ended. In addition, the debtor lost $300 in cash, a cellular phone with about 400 installed minutes, some clothes, including an official U.S. Postal Service uniform jacket, and some paperwork he was taking to his attorney.

Specifically, the testimony of the debtor and his wife established that the debtor purchased a 1996 Buick in February 2006 from Precision Auto Sales at its corporation's CS III location. Precision financed the vehicle. When he filed his Chapter 13 petition on December 12, 2006, the debtor listed Precision on his petition at the Lomb Avenue address because that was where he sent his pre-bankruptcy payments and that was the address on the receipts he received from making those payments.[10]

The debtor learned from his stepson on Saturday, September 9, 2006, that his car had been repossessed. The debtor was in his bathroom shaving when his stepson came in and told him that two men had taken the car. He called Mr. Smith but did not

---

[10] As explained before, Mr. Smith contends that the initial notices about this bankruptcy were sent to Precision on Lomb Avenue, the wrong location for him to get his mail. Through his corporation's attorney, he explained that it was not until he worked this out that he received the mail that was sent to Precision. The Court guesses that also applied to the payments the debtor was sending to Precision.

reach him.  Mr. Smith called him later that morning.  During that conversation the debtor told Mr. Smith that he was in debtor's court to which Mr. Smith replied that "he didn't run his cars like that."  The debtor asked Mr. Smith to give him until Monday morning when he and his attorney would call him to discuss the repossession and the bankruptcy.[11]

On Monday, September 11, 2006, the debtor went to his attorneys office.  They called Mr. Smith on a speaker telephone.  Again, after being told about the bankruptcy, Mr. Smith told the debtor and his attorney that "he didn't run his cars like that." The debtor testified that Mr. Smith was, "being real smart about it."[12]

Some of the debtor's personal property was in the vehicle when it was repossessed.  There was a cellular telephone with about 400 minutes installed.[13]  There was $300 in cash under the vehicle's floor mat (the debtor had just been paid).  Also in the car were some personal clothes, including a United States Postal Service uniform jacket, some paper work and other documents relating to his Chapter 13 case which he was taking to his attorney.[14]

The debtor works a shift with the U.S. Postal Service from 2:15 a.m. to 10:45 a.m.  After his car was repossessed, his wife got up with him and took him to work at 2:00 a.m.  After returning home, she got her children ready for school and then went to work herself.

Because the debtor did not have a car, he would catch a ride home with the mail truck that left the downtown postal facility for Dolomite, Alabama.  That location was within walking distance of his home.  The debtor would then walk the rest of the way home.

---

[11] While he was not at the trial to testify, as was the debtor, through defendant's counsel, Mr. Smith denies that this conversation occurred.

[12] Again, although Mr. Smith did not testify, through his corporation's attorney, he denies that this second conversation occurred.

[13] The debtor's wife called his cellular telephone after the repossession and someone answered.

[14]Through his corporation's counsel, Mr. Smith told the Court that when his agents came to repossess the vehicle, that the debtor was there and gave the vehicle's keys to the agents. His contention was that the debtor assisted in the repossession and could have retrieved personal property from the car before handing over the keys.  Of course, there is absolutely no evidence to support these contentions.  In contrast to Mr. Smith's contentions, the debtor testified that he was shaving when the car was repossessed and did not have any contact with the repossession agents.

10

Without his vehicle, the debtor could not remain on the job and work overtime as he did almost every day, sometimes six days a week.  He testified that he would usually work two extra hours on each shift.  Without the car from September 9 to October 26, he testified he lost $800 in overtime pay.

After the car was repossessed, the defendant sent the debtor a letter explaining that the defendant had his car.  Notwithstanding that the repossession occurred after the debtor had filed bankruptcy, the letter was very demanding and threatening.  It read:

> We have your vehicle, as follows: 94 BUICK CENTURY because you failed to comply with the terms of our agreement.  We plan to sell this vehicle.  You can get this vehicle back before we sell it by paying the entire amount you owe (not just the past due payments) including our expenses.  This amount is currently 2,739.22 but may go up if our expenses go up.
>
> .....
>
> If you do not redeem this vehicle we will sell this vehicle.  You have the right to demand a public sale.  If you do not notify us that you demand a public sale then we will sell the vehicle at a private sale.  We will sell this vehicle as soon as 10 days from the date of this notice.

Plaintiff's Exhibit 1.  Of course, the defendant did not have the right to send this letter, much less, commit the acts it threatened.

The debtor was allowed to retrieve his vehicle on October 26, 2007, the same day the Court held a final hearing on the debtor's Complaint to Compel Turnover of Automobile and for Violation(s) of the Automatic Stay (filed September 14, 2006).  The vehicle was on one of the defendant's car lots.  It would not start.  The windows were down.  The inside was wet from rain.  None of the personal property was in the vehicle, including his official U.S. Postal Service jacket.  None have been returned to the debtor.

The debtor's wife testified.  She supported her husband's testimony as it related to her actions.  She did add, when asked if she lost wages because of the repossession, that she did not, but that she had lost some sleep!

Ms. Lawanda Welch, the defendant's administrative manager testified.  Ms. Welch processed most of the paperwork when a vehicle was purchased from Precision, including the documentation necessary for financing.  She testified that the debtor would have purchased the vehicle from the CS III location and that the paperwork for the purchase would have been processed at that location.

Ms. Welch confirmed that "Stacy" was an employee of the defendant.  She also confirmed that the defendant had two locations.  One was the Precision location on

Lomb Avenue and the other was the corporate location for CS III on 18th Street.[15] She explained that the overall operation was very large. There were two large lots with hundreds of cars. They also have a body shop and back lot storage.

Mr. Marvin Kidd, a salesman for the defendant, also testified for the defendant. Mr. Kidd was present when the debtor came to retrieve his vehicle, which Mr. Kidd testified was about 10 days to two weeks after the repossession, not about two months later as the debtor testified.[16] Mr. Kidd testified that it was the defendant's standard practice when there were personal items in a repossessed vehicle that someone would "bag" those items and store them. He was not involved in the repossession of the debtor's vehicle and did not retrieve the personal items from the car. He did not know where those items were.

### F. Summary of Factual Conclusions

There is absolutely no evidence that the defendant did not receive notice of the bankruptcy filing, the notices for hearings before this Court, or the orders of this Court. The only contrary information is the defendant's principal's secondhand assertions that he did not receive the documents and did not have notice of the bankruptcy for the almost two months that the debtor attempted to reclaim his vehicle. And the only defense the defendant can muster is that the only notice that it received went to a second location operated by the defendant. The defendant's administrative manager described the business as a big operation. It has two locations, a junk yard, a paint and body shop, a sales office, a sales area, and back lot storage. The representation was made that the two locations were <u>around the corner from each other</u>!

This Court cannot accept that even if the above documents went to a second location, that it took almost two months for that mail to find its way to the correct location, or that mail is not delivered to both locations frequently, or that Mr. Smith does not have a procedure in place for all mail to be reviewed.

And even if those conclusions are incorrect, the evidence is undisputed that Mr. Smith called the debtor shortly after the car was repossessed and the debtor explained that he was in bankruptcy. In addition, the debtor and his attorney called Mr. Smith on the Monday after the repossession and again told Mr. Smith that the bankruptcy had been filed and the paperwork for that case was in the trunk of the car that was repossessed. But, although he did not testify, through his corporation's attorney, Mr. Smith denied that he had the telephone conversation with the debtor and the debtor's

---

[15] The representation was made that the two locations were around the block from each other.

[16] There is no dispute that the debtor did not get his car back until October 26, 2006, after the September 9, 2006, repossession.

attorney on that Monday, a telephone call that the debtor's attorney represented to this Court that he had with Mr. Smith, and one that the debtor testified under oath, (something Mr. Smith was not willing to do), did occur.

And even if these conclusions are not correct, there is the certificate of service by debtor's counsel that the amended complaint was served on the defendant at the"main" location on October 3, 2006, for which a return receipt card was signed by Stacy, one of the defendant's employees. But still, it was another 23 days before the defendant returned the vehicle.

There is also absolutely no evidence that the defendant even attempted to secure the debtor's personal property after the car was repossessed. The uncontroverted evidence is that the next time the debtor saw his car after the repossession, the car would not start, the windows were rolled down, the inside of the car was wet from rain, and all of the personal property was missing. None of that property has been returned to the debtor.

In addition to his loss of personal property, the debtor lost wages, particularly in regard to overtime he could have worked. The debtor also had damages of attorney fees and costs. The debtor proved damages of $1,100 ($800 in lost wages and $300 lost cash.)[17]

The defendant was aware, through notice from this Court, that the debtor filed a bankruptcy case. The defendant was aware, from Mr. Smith's first telephone conversation with the debtor, that the debtor filed a bankruptcy case. The defendant was aware, from Mr. Smith's second telephone conversation with the debtor, that the debtor filed a bankruptcy case. The defendant was aware, from the complaint the debtor filed, that the debtor filed a bankruptcy case. The defendant was aware, from notices from this Court regarding hearings on the debtor's complaint, that the debtor filed a bankruptcy case. The defendant was aware, from Orders entered by this Court, that the debtor had filed a bankruptcy case. But, in complete disregard of all of this notice, Mr. Smith caused the debtor's automobile to be repossessed and held it for almost two months.

And where was Mr. Smith while this Court was attempting to resolve these matters? "Mr Smith wasn't able to able to make it this morning."

---

[17] Although the debtor may be entitled to damages for wages for full days he could not work, for attorney fees in prosecuting this action, costs of prosecuting this action, his lost clothes, and the value of his cellular telephone with the banked minutes, there was no evidence offered to prove those damages. In regard to attorney fees, the confirmation order entered on December 12, 2006, awarded the debtor's attorneys a fee of $1,800. There is no evidence of what portion of that fee is attributable to the work (or the time spent and work performed) on the instant matter or whether the debtor and his attorneys entered into a separate contract.

13

## V. Issues

Did the defendant willfully violate the automatic stay? If it did, was the debtor injured by that willful violation for which he is entitled to compensatory damages? Are there appropriate circumstances under which the debtor may recover punitive damages?

## VI. Conclusions of Law

### A. The Defendant Willfully Violated the Automatic Stay

Based on the evidence, the Court concludes that the defendant willfully violated the automatic stay. Specifically, the Court finds: (1) the stay was in effect when the defendant repossessed the debtor's vehicle; (2) the defendant was either aware of the debtor's bankruptcy filing and knew of the stay when the case was filed, or learned of the filing and the stay shortly after the repossession; and (3) the defendant intentionally violated the stay, that is, it intentionally repossessed the debtor's vehicle while the stay was in effect or held the debtor's vehicle after learning of the filing and the stay. Based on those findings, the Court concludes the defendant willfully violated the automatic stay and, "intentionally committed the violative act, regardless of whether the violator specifically intended to violate the stay." Jove Eng'g, Inc. v. Internal Revenue Serv., 92 F.3d 1539, 1555 (11th Cir.1996).

The defendant's actions were multiple, willful violations of the stay. First, the Court finds that the defendant had notice of the bankruptcy filing, but even if did not, it had notice, on the day of the repossession and again two days later, of the pending bankruptcy case. Then one of its employees signed for a certified letter containing an amended complaint for turnover, but still, the defendant did not release the debtor's vehicle.

Second, even if a creditor was not aware of a bankruptcy filing, (which is not the case here), this repossession occurred after the bankruptcy was filed. It is not like a situation where a repossession occurs before a bankruptcy is filed and the debtor contends he is entitled to have the car returned. This was at best a technical violation of the stay where the creditor then refused to return the vehicle after learning the stay had been violated. In this situation, the creditor continued to violate the stay and that violation was willful. The court in Stmima Corp. v. Carrigg (In re Carrigg), 216 B.R. 303, 305 (1 st Cir. BAP 1998) wrote:

> the creditor's refusal to voluntarily turn over property of the estate to the debtor after it had notice of the bankruptcy constitutes yet another wilful violation of the stay. See In re Johnson, 138 B.R. 352, 354 (Bankr. D.R.I.1992) ( "wilfulness" is established if the violator is aware of the stay and if its post-petition actions were intentional); Abrams, 127 B.R. at 242-43 ( § 362(h) provides the remedy for failure to turn over property of the estate pursuant to § 542).

14

Id. at 305.

The facts in the instant case are similar to those in In re Davis, 265 B.R. 453, (Bankr. N.D. Fla. 2001). And the results are the same, even where the facts in Davis were that the creditor's technical violation of the stay was without knowledge of the stay. But because the creditor then held the car, the court in Davis found that the stay violation was willful. The court wrote:

> A creditor who has lawfully repossessed an automobile prior to the filing of a bankruptcy petition is obligated to promptly deliver to the debtor or to the estate the vehicle upon learning of the bankruptcy filing. In re Brooks, 207 B.R. 738 (Bankr. N.D. Fla.1997). Here, the Defendant did not lawfully repossess the vehicle prior to the filing of the bankruptcy petition but, instead, repossessed the day after the petition was filed. While the repossession itself constituted a technical violation of the stay, the Defendant not act willfully in violation of the stay since it did so without knowledge of the stay's existence. In In re Belcher, 189 B.R. 16 (Bankr. S.D. Fla.1995), the court under circumstances somewhat similar to those in the instant case found that a creditor who retained a vehicle for nine days following notification that it had mistakenly repossessed an automobile post-petition was liable for the payment of debtor's actual damages plus attorney's fees. In this case, the creditor retained possession of the vehicle for 29 days after having been notified of the filing of bankruptcy prior to the repossession. As this court held in Brooks, not only must the creditor release the vehicle to the debtor, "the collateral must be returned to the locale of the repossession". 207 B.R. at 739. At no time did the Defendants in this case make any effort to actually return Plaintiff's van to her.

Id. at 457 (emphasis added).

This debtor had stable employment. His confirmation hearing was scheduled. He proposed to pay the defendant. The defendant did not object to that proposal, but instead repossessed the debtor's vehicle and then sent the debtor a letter which threatened the debtor with all sorts of harm, and demanded certain actions from the debtor. Of course, all of those threats and demands were, like the repossession itself, in violation of the automatic stay, and all occurred after the debtor and his attorney advised Mr. Smith that the debtor had filed a Chapter 13 bankruptcy case.

The defendant's repossession of the debtor's vehicle was a willful violation of the automatic stay. The next issue is was the debtor damage by that violation.

15

## B.  The Debtor Was Injured by that Willful Violation
## and is Entitled to Actual Damages,
## Including Costs and Attorney Fees

As explained above, the debtor was injured by the defendant's repossession of his vehicle, an act that this Court found to be in willful violation of the automatic stay. Therefore, the debtor is entitled to the actual damages proved.  The debtor proved damages of $1,100.  Eight hundred dollars are attributable to lost wages.[18]  Three hundred dollars are attributable to loss of the cash in the debtor's vehicle when it was repossessed.  There was no proof of any other damages.

The next issue is whether the debtor is entitled to punitive damages.  This issue is more complicated than the above ones.  But in the final analysis, the Court finds that the debtor is entitled to punitive damages.

## C.  The Debtor is Entitled to Punitive Damages

As stated above, the general rule is that punitive damages for stay violations may be awarded in "appropriate circumstances."  More specific rules govern when those damages may be awarded and in what amount.

In bankruptcy cases, there are two standards to consider.  The first is unique to bankruptcy cases where punitive damages are considered for a willful stay violation. The second is general to all cases to determine the amount of punitive damages.[19]

## 1.  The Standard in Bankruptcy Cases for
## Awarding Punitive Damages for a Willful Stay Violation

The court in In re Roche, 361 B.R. 615 (Bankr. N.D. Ga. 2005) lists factors which courts have considered in deciding whether to award punitive damages for a willful violation of the stay.  The court wrote:

> The imposition of punitive damages for a violation of the automatic stay is appropriate when the violator acts in an egregious intentional manner. In re Hedetneimi, 297 B.R. 837, 843 (Bankr.M.D.Fla.2003) citing In re Rivers, 160 B.R. 391, 394 (Bankr.M.D.Fla.1993). Courts have held that punitive damages are authorized in situations where a violator's acts are

---

[18]  Loss of employment and wages are actual damages.  See this Court's opinion in Cox v. Billy Pounds Motors, Inc. (In re Cox), 214 B.R. 635 (Bankr. N.D. Ala.1997) citing McMillian v. F.D.I.C., 81 F.3d 1041, 1055 (11th Cir.1996) and In re Esposito, 154 B.R. 1011, 1015 (Bankr. N.D. Ga.1993).

[19]These standards are similar.

16

egregious, malicious, or accompanied by bad faith. <u>Cox v. Billy Pounds Motors (In re Cox)</u>, 214 B.R. 635, 645 (Bankr.N.D.Ala.1997). In determining whether circumstances exist for an award of punitive damages under § 362(h), <u>Courts rely on a variation of the following factors: (1) the nature of the defendant's conduct; (2) the nature and extent of the harm to the plaintiff; (3) the defendant's ability to pay; (4) the motives of the defendant; and (5) any provocation by the debtor.</u> See <u>In re Wagner</u>, 74 B.R. 898, 905 (Bankr. E.D. Pa.1987); <u>Heghmann v. Indorf (In re Heghmann)</u>, 316 B.R. 395, 405-406 (1st Cir. BAP 2004); <u>Keen v. Premium Asset Recovery Corp. (In re Keen)</u>, 301 B.R. 749, 755 (Bankr. S.D. Fla.2003); <u>Bishop v. U.S. Bank/Firstar Bank, N.A. (In re Bishop)</u>, 296 B.R. 890, 898 (Bankr. S.D. Ga.2003).

<u>Id</u>. at 624 (emphasis added). This Court has applied those factors in this case.

1. <u>The Nature of the Defendant's Conduct</u> - First, in regard to the specific act of repossessing the vehicle, the Court finds that while there is no evidence that the defendant's action breached the peace, "[w]hen one considers the spectrum of stay violations from mailing bills or account statements to harassing telephone calls, automobile repossessions and home foreclosures, an instance where bodily harm is threatened is, as the bankruptcy court recognized, serious indeed." <u>In re Ocasio</u>, 272 B.R. 815, 826 (1st Cir. BAP 2002).

Second, in regard to the defendant's actions <u>after</u> the vehicle was repossessed, this Court has considered, as have others, whether there was "an arrogant defiance of the federal law demonstrated." <u>Matter of Mullarkey</u>, 81 B.R. 280, 284 (Bankr.N.J.1987). There was in this case. Not only did the defendant violate the stay when it repossessed the vehicle (whether that was a technical violation or more), but after repeated notices from the debtor, the debtor's attorney, and this Court, the defendant callously disregarded those notices and refused to turnover the debtor's vehicle. In addition, the defendant did not find the proceedings before this Court to be important enough to participate. And even when the defendant decided that obeying the law was better than not, the defendant did not return the vehicle. The debtor had to go to the debtor's car lot and <u>pick up</u> his vehicle. And when he did, he found the car would not start, the windows were down, the inside was wet from rain, and none of his personal property was anywhere to be found.

The nature of the defendant's conduct was, as quoted above, "an arrogant defiance of the federal law..." <u>Id</u>.

2. <u>The Nature and Extent of the Harm to the Plaintiff</u> - The debtor's actual damages are discussed above.

3. <u>The Defendant's Ability to Pay</u> - There is no evidence that the defendant cannot pay both the actual and punitive damages being awarded to the debtor.

17

4. <u>The Motives of the Defendant</u> - At almost every instance where the defendant's principal was told that the debtor had filed a bankruptcy petition, and therefore that the repossession was in violation of the automatic stay, the defendant's principal stated that he "didn't run his cars like that." Apparently, the defendant's motives are to hamper debtors such as this one when bankruptcy cases are filed, and the defendant does not want to acknowledge that when bankruptcies are filed, its associations with those filing those cases changes.

5. <u>Any Provocation by the Debtor</u> - There was no provocation by the debtor. In contrast, the debtor had made a Chapter 13 plan payment before the vehicle was repossessed, his confirmation hearing was set, and he proposed to pay defendant.

As stated above, the facts in this case are similar to those in <u>In re Davis</u>, 265 B.R. 453 (Bankr. N.D. Fla. 2001). In regard to punitive damages, the court in <u>Davis</u> wrote:

> An award of punitive damages under § 362(h) requires not only a willful violation of the automatic stay but there must be also the existence of appropriate circumstances to justify such damages. "Appropriate circumstances" has been interpreted to mean "egregious, intentional misconduct on the violator's part". <u>In re Knaus</u>, 889 F.2d 773, 776 (8th Cir.1989). In the instant case, I find that the actions of the Defendants Gatorwheel, Inc. and Iraj Ghahdarijani rise to the level of egregious intentional misconduct. <u>For almost a month, the Plaintiff was denied the use of her vehicle while Defendants had full knowledge of the pendency of her Chapter 13 proceedings and of their obligation to return the vehicle to her</u>. They verbally abused her in her efforts to obtain possession of the vehicle and caused her tremendous time and inconvenience. This misconduct justifies the imposition of punitive damages in this action. Based on the foregoing, I find that Gatorwheel, Inc. and its owner and President, Iraj Ghahdarijani willfully violated the automatic stay provided by § 362(a) and that appropriate circumstances exist for the imposition of punitive damages pursuant to § 362(h).

<u>Id</u>. at 457 (emphasis added).

The same is true here. Even if the defendant is given the benefit of this Court finding that the repossession was only a technical violation of the stay, when the defendant repeatedly ignored the notices from the debtor, the debtor's attorney, and this Court and then did not participate in any formal resolution of the problems it had caused, appropriate circumstances arose that require this Court to award punitive damages

Therefore, based on the above, the Court finds that there are "appropriate circumstances" for awarding punitive damages against the defendant. The defendant's

18

actions were an affront to the law, an affront to the debtor, and an affront to the Court. The Court finds those circumstances were egregious, vindictive, malicious, or accompanied by bad faith.

### 2.  The Standard in All Cases for
### Determining the Amount of Punitive Damages

Cases decided since 1996 tend to apply the three guideposts established by the United States Supreme Court in BMW of N. Am., Inc. v. Gore, 517 U.S. 559 (1996) to determine whether the amount of a punitive damage award is appropriate.  Writing for the Court of Appeals for the Eleventh Circuit in Bogle v. McClure, 332 F.3d 1347 (11th Cir. 2003), Circuit Judge Susan H. Black described those guideposts as:

> (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. Gore, 517 U.S. at 575, 116 S.Ct. at 1598-99. We conduct a de novo review of the trial court's application of the Gore guideposts to the jury's punitive damage award. Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 436, 121 S.Ct. 1678, 1685-86, 149 L.Ed.2d 674 (2001).

Id. at 1360.  See also U.S. E.E.O.C. v. W&O, Inc., 213 F.3d 600 (11th Cir. 2000).[20] This Court has applied those guideposts in this proceeding.

### a.  The Degree of Reprehensibility
### of the Defendant's Misconduct

The opinion in U.S. E.E.O.C. v. W&O, Inc., 213 F.3d 600 (11th Cir. 2000) guides this Court through this first guidepost.  It reads in part:

> "Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." BMW, 517 U.S. at 575, 116 S.Ct. at 1599. In assessing the reprehensibility of the defendant's conduct in BMW, the Supreme Court noted a number of "aggravating factors," including (1) whether the harm was not "purely economic in nature"; (2) whether the defendant's conduct "evinced ... indifference to or reckless disregard for the health and safety of others"; and (3) whether, if there was economic injury inflicted, the injury was "done intentionally through affirmative acts of misconduct or

---

[20] See In re Ocasio, 272 B.R. 815 (1st Cir.BAP 2002) for an excellent explanation of, and discussion of, these factors.

19

when the target [was] financially vulnerable." Id. at 576, 116 S.Ct. at 1599 (citation omitted).

Id. at 614.  This Court has applied those three factors in this case.

## (1)  The harm here was not purely economic

The harm here was not purely economic.  As explained above, while the debtor has substantial monetary damages, he and his wife suffered greatly because of the repossession.  And that is addition to the affront to the law and this Court by the defendant.

Because of the repossession, the debtor's wife had to get up with the debtor for his 2:00 a.m. shift, take the debtor to work, come home, get her children ready for school, and then go to work herself.  This lasted almost two months.

Because of the repossession, the debtor had to catch a ride home on a mail truck going towards his home, and then had to walk the rest of the distance.

After the repossession, the debtor, the law, and this Court were ignored by the defendant and its principal, and that occurred after repeated attempts to have both of them recognize the law and to participate in these proceedings.

## (2)  The defendant's conduct was
## indifferent to the health and safety of others

Again, while there is no evidence that the defendant's action breached the peace, "[w]hen one considers the spectrum of stay violations from mailing bills or account statements to harassing telephone calls, automobile repossessions and home foreclosures, an instance where bodily harm is threatened is, as the bankruptcy court recognized, serious indeed." In re Ocasio, 272 B.R. 815, 826 (1st Cir. BAP 2002).

## (3)  The economic injury inflicted was intentional
## through affirmative acts of misconduct
## when the target was financially vulnerable

This factor is especially relevant in bankruptcy cases.  In bankruptcy cases, the target is the debtor.  What better example of a financially vulnerable target is there than a bankruptcy debtor?

Clearly, as held above, the defendant's actions caused economic injury.  Its actions were intentional.  They were affirmative.  They were through misconduct.  And they were aimed at a bankruptcy debtor who was financially vulnerable.

20

### b. The Disparity between the Actual or Potential Harm
### Suffered by the Plaintiff and the Punitive Damages Award

The second guidepost from <u>BMW</u> is to consider the disparity between, or ratio of, actual damages to punitive damages. Writing for the Court in that case, Justice John Paul Stevens explained what a court <u>should not</u> do. Justice Stevens explained:

> Of course, we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award. <u>TXO</u>, 509 U.S., at 458, 113 S.Ct., at 2720. Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine. It is appropriate, therefore, to reiterate our rejection of a categorical approach. Once again, "we return to what we said ... in <u>Haslip</u>: 'We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case. We can say, however, that [a] general concer[n] of reasonableness ... properly enter[s] into the constitutional calculus.' " <u>Id</u>., at 458, 113 S.Ct., at 2720 (quoting <u>Haslip</u>, 499 U.S., at 18, 111 S.Ct., at 1043). In most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this basis. When the ratio is a breathtaking 500 to 1, however, the award must surely "raise a suspicious judicial eyebrow." <u>TXO</u>, 509 U.S., at 481, 113 S.Ct., at 2732 (O'Conner, J., dissenting).

<u>Id</u>. at 583-84 (footnote omitted).

But Justice Stevens offered this guidance:

> In <u>Haslip</u> we concluded that even though a punitive damages award of "more than 4 times the amount of compensatory damages" might be "close to the line," it did not "cross the line into the area of constitutional impropriety." 499 U.S., at 23-24, 111 S.Ct., at 1046. <u>TXO</u>, following dicta in <u>Haslip</u>, refined this analysis by confirming that the proper inquiry is " 'whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred.' " <u>TXO</u>, 509 U.S., at 460, 113 S.Ct., at 2721 (emphasis in original), quoting <u>Haslip</u>, 499 U.S., at 21, 111 S.Ct., at 1045. Thus, in upholding the $10 million award in <u>TXO</u>, we relied on the difference between that figure and the harm to the victim that would have ensued if the tortious plan had succeeded. That difference suggested that the relevant ratio was not more than 10 to 1.

21

<u>Id</u> at 581 (footnote omitted).

### c. The Difference between the Punitive Damages Awarded and the Civil Penalties Authorized or Imposed in Comparable Cases.

The third guidepost from <u>BMW</u> is a comparison of the case under review to other cases. As some courts have recognized, that may be difficult in bankruptcy cases. The court in <u>In re Ocasio</u>, 272 B.R. 815 (1st Cir.BAP 2002) explains:

> Obviously, this latter guidepost poses something of a problem as there is not a complex of statutory scheme designed to respond to violations of the automatic stay other than the Bankruptcy Code itself. Significantly, § 362(h) specifically provides for the award of punitive damages. Thus, creditors must be presumed to be on notice that if they violate the automatic stay they will be liable for punitive damages. In this case, Varela was aware of the automatic stay. Moreover, he testified that other customers of his various businesses who owed him money had filed petitions in the bankruptcy court. As the owner of a number of businesses which extended credit, Varela exhibited a level of sophistication that weights against a reduction of the punitive damage award.

<u>Id</u>. at 826 (footnote omitted).

Another remark by the court in <u>Ocasio</u> helps explain the difficulty of applying this third factor in bankruptcy cases. It reads:

> Bankruptcy court decisions are far from uniform with respect to when and under what circumstances punitive damages are awarded. A survey of bankruptcy cases in which punitive damages have been both awarded and denied is included in Eric C. Surette, Remedies and Damages for Violations of the Automatic Stay Provisions of the Bankruptcy Code (11 U.S.C. § 362(h)) by Parties Other than the Federal Government, 153 A.L.R. Fed. 463, § 7 (1999). Considering the factors articulated by both the United States Supreme Court and the First Circuit, as well as punitive damage awards made by other courts, we find that under the circumstances of this case, the $9,000 award was justified.

<u>Id</u>. at 827.

This Court finds the comments of the court in <u>In re Han</u>, 333 B.R. 881 (Bankr. N.D. Fla. 2005) helpful in deciding the extent of the application of this third guidepost in this Circuit. The court wrote:

> Punitive damages are awarded in response to particularly egregious conduct for both punitive and deterrent purposes. Such awards are

reserved for cases in which the defendant's conduct amounts to something more than a bare violation justifying compensatory damages or injunctive relief. To recover punitive damages, the defendant must have acted with actual knowledge that he was violating the federally protected right or with reckless disregard of whether he was doing so.
Wagner, 74 B.R. at 903 (quoting in part Cochetti v. Desmond, 572 F.2d 102, 106 (3rd Cir.1978))

The Second Circuit Court of Appeals stated that a punitive damage award required an "additional finding of maliciousness or bad faith on the part of the offending creditor." In re Chateaugay Corp., 920 F.2d 183, 186, n. 1 (2nd Cir.1990). Other cases have required "an arrogant defiance of the federal law demonstrated." Matter of Mullarkey, 81 B.R. 280, 284 (Bankr.D.N.J.1987). Bankruptcy cases in this circuit have followed these or similar cases and have not awarded punitive damages without weighty circumstances. Bishop v. U.S. Bank/Firstar Bank, N.A. (In re Bishop), 296 B.R. 890 (Bankr. S.D. Ga.2003); Flynn v. Int. Rev. Service (In re Flynn), 169 B.R. 1007 (Bankr. S.D. Ga.1994).

Id. at 889 (emphasis added).

How a stay violator is treated in bankruptcy cases varies because of the many different circumstances that can arise. But it is clear to this Court that where a violator's actions rise to the level of this defendant's, courts impose punitive damages. As Judge Margaret Mahoney wrote in Han, "Bankruptcy cases in this circuit have followed these or similar cases and have not awarded punitive damages without weighty circumstances." Id. There are "weighty circumstances" in this case. As a general comparison to cases in this Circuit where such circumstances exist, a finding that punitive damages should be awarded here is comparable.

### d. Conclusion on the Amount of Punitive Damages

The above demonstrates that "appropriate circumstances" exist, therefore the Court finds that punitive damages should be awarded. Based on the degree of those circumstances, the Court finds that a ratio of punitive damages to actual damages of 5 to 1 is appropriate. The debtor proved $1,100 in actual damages. Therefore the amount of the punitive damages is $5,500.

### D. Conclusion to the Amount of Damages

The debtor is entitled to actual damages of $1,100 and punitive damages of $5,500, for a total of $6,600.

## VII.  Conclusions

The defendant wilfully violated the automatic stay.  The debtor was injured by that violation.  The debtor is entitled to actual damages of $1,100 and punitive damages of $5,500.  And the debtor is entitled to a judgment against the defendant for $6,600.

A separate order will be entered in accord with this memorandum opinion.

Dated: August 7, 2007                    /s/Benjamin Cohen
                                         BENJAMIN COHEN
                                         United States Bankruptcy Judge

BC:pb

24